In the Interest of Samuel Ray VANDERBEEK, a child.

Norma Louise VANDERBEEK.

No. 2-57520.

Supreme Court of Iowa.

July 31, 1975.

Robert C. Gross, Cedar Rapids, for appellant.

Richard C. Turner, Atty. Gen., Stephen P. O'Meara, Asst. Atty. Gen., and William C. Faches, Linn County Atty., for the State of Iowa.

David S. Good, Cedar Rapids, for Samuel Ray Vanderbeek.

Heard before MOORE, C. J., and MASON, RAWLINGS, LeGRAND, and McCORMICK, JJ.

LeGRAND, Justice.

This is an appeal by Norma Louise Vanderbeek seeking to reverse an order of the juvenile court of Linn County by which parental rights to her son, Samuel Ray Vanderbeek, (hereafter called Sammy) were terminated under the provisions of § 232.41, The Code. We affirm the trial court.

A termination order was also entered as to Rodger Dwayne Vanderbeek, the boy's father. He filed a separate notice of appeal. However, he filed no brief in support of his appeal nor was he represented when this case was orally submitted. He has apparently abandoned this effort to save his paternal rights to Sammy, and the trial court's order as to him is final.

The statute under which these proceedings were brought (§ 232.41) provides in part:

"The [juvenile] court may upon petition terminate the relationship between parent and child:

1. * * *

2. If the court finds that one or more of the following conditions exist:

a. * * *

b. That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection.

c. That although financially able, the parents have substantially and continuously neglected to provide the child with necessary subsistence, education, or other care necessary for physical or mental health or morals of the child or have neglected to pay for subsistence, education, or other care of the child when legal custody is lodged with others.

d. That the parents are unfit by reasons of debauchery, intoxication, habit-

ual use of narcotic drugs, repeated lewd and lascivious behavior, or other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child.

e. * * *."

Although the trial court made no specific mention of the ground relied on, we hold the evidence justifies the termination order under 2(b), 2(c), or 2(d) of the statute.

The evidence before us lays bare a course of physical abuse visited upon Sammy by his mother which, under our de novo review, leads us to the same conclusion reached by the trial court—the future protection and safety of this boy demands a termination of Norma's parental rights.

This case is not like *In Re the Interest of Baby Boy Scarlett,* Iowa, 231 N.W.2d 8, filed June 25, 1975, where we found a mother willing but unable to provide her son with necessary care and protection; nor is it similar to *In Re the Interest of Robbins et al.,* Iowa, 230 N.W.2d 489, filed June 25, 1975, where there was a deliberate parental refusal to care for young children. Here we have a mother who provided well for the material needs of her son much of the time, but who on other occasions—25% of the time, according to her—was unable to control her conduct toward him, and was admittedly abusive.

For Sammy this resulted in numerous instances of serious physical injury, at least one of which was nearly fatal. Just as portentous are the ominous predictions by several expert witnesses of continued and recurring abuse if he is returned to Norma's care.

Norma and Rodger, whose marriage is now foundering, were married September 7, 1969. Sammy, born October 14, 1970, was placed with them for adoption in April of 1971, when he was six months old. Within a few days after the boy was placed in their home, Rodger and Norma left Iowa for Arizona, where Rodger was stationed for training as an Air Force pilot.

Approximately seven months later—November 24, 1971—the first and most serious reported incident of physical abuse occurred. Sammy was then 13 months old. For some time, his survival was doubtful. Some of the circumstances of this event are disputed, but it is clear Sammy was hit or pushed hard enough to suffer a fracture of the skull. At the same time a towel was stuffed in his mouth to "keep him from vomiting." He almost suffocated.

At first Rodger assumed responsibility for this event but later testified he did so only to protect Norma. Norma did not deny this, and the evidence is persuasive that it was she who must take the blame for this serious injury to Sammy.

The boy suffered a cerebral edema, described as a swelling of the brain due to trauma. He was temporarily paralyzed on one side of the body. He seemed to progress well, but about three months later had a seizure or convulsion and was again admitted to the hospital in an unconscious condition. After extensive investigation, it was discovered he suffered from subdural hematomas, which are collections of blood underneath the skull pressing on the brain.

After other treatment had failed, surgery was performed. Plastic tubes, or shunts, were placed underneath the skull to permit drainage of excess fluid from the skull bone into the pleural spaces where it would become absorbed. This is to prevent a buildup of fluid underneath the skull bone causing pressure on the brain. These tubes are still in place and will remain there permanently unless they should later cause trouble. There still remains the possibility of further harmful permanent effects from this injury.

On March 30, 1973, when Sammy was two-and-a-half years old, he was brought to the University Hospital at Iowa City as an outpatient for neurological evaluation. Examination at that time revealed he had multiple bruises, a blackened left eye, a questionable burn on the posterior neck, and crushed fingernails on both hands. No

satisfactory explanation was given for any of these injuries.

He was readmitted to the hospital on August 6, 1973, for what is referred to as a "work-up for questionable abuse." Following this work-up, a report was made to the Linn County Department of Social Services describing Sammy as a victim of child abuse. This report was based partially upon the repeated unexplained injuries suffered by the boy and partially upon Norma's admissions that she frequently lost control of herself when disciplining Sammy.

The boy was released from the hospital on August 10, 1973, and next returned February 25, 1974, for another neurological follow-up to make certain the shunts implanted at the time of the brain surgery were operating properly. They were, but it was then discovered there were three additional episodes of abuse between August 10, 1973, and February 25, 1974. These included a severe bite on the nose, a laceration of the forehead which required eight stitches, and a burn on the left forearm approximately six inches long and an inch and a half wide.

The bite on the nose remains unexplained, but it occurred while Sammy was with his mother. The laceration to the forehead was caused when Sammy refused to eat and Norma pushed a glass jar against his head and face. Norma testified the second-degree burn was accidentally caused when Sammy touched a hot iron, but there is testimony the nature and extent of the injury make this extremely unlikely. In this regard, the trial court said Norma's testimony was "incredible." We agree with that appraisal.

As did the trial court, we rely strongly upon the testimony of Dr. Gerald Solomons, a professor of pediatrics at the University of Iowa College of Medicine, who is also chairman of the child abuse committee of the University Hospitals at Iowa City and has specialized for the past six or seven years in child abuse cases.

The testimony of Dr. Solomons weighs heavily against Norma. He stated persons like Norma are sick, acting under compulsion, not malice. We set out part of his testimony:

"Q. Doctor, based upon your education, your background and your experience, do you have an opinion as to whether or not Samuel Ray Vanderbeek is an abused or battered child?

"A. There is no doubt in my mind that this child is a classical case of the child abuse syndrome."

In response to another question he said:

"On the basis of all that, the abuse, the fact that the child was even abused when out of the home when with the mother makes me believe that this child is in extreme danger—in extreme danger, if the child is placed in such an environment. The reason I base that on is the fact that there are statistics * * * that state if a child is a reported child abuse [case] and [is] placed back in the home without an adequate program for the protection of the child and the rehabilitation of the parent, 25 to 50 percent of the time this child will either be murdered or maimed severely for life within a few months.

"Q. Doctor, based on your experience and your education and your training, do you have an opinion as to whether it would be in the child's best interests, Sammy Vanderbeek's best interests, that the parent-child relationship be terminated?

"A. Undoubtedly it should be terminated."

As a final conclusion, the doctor testified as follows:

"I would vehemently plead that this child be removed from the home."

■ It is quite true, as Norma argues, that much of Dr. Solomons' testimony is based upon medical, hospital and social agency reports. This type of hearsay evidence is admissible to the extent of its probative value. § 232.46, The Code; *In Re the Interest of Baby Boy Scarlett,* 231

N.W.2d 8 (Iowa 1975); *In Re the Interest of Delaney,* 185 N.W.2d 726, 732 (Iowa 1971).

Confronted with these repeated incidents of physical abuse, we cannot escape the result reached by the trial court. We, too, find Norma has forfeited her right to her son.

She freely admits she has abused Sammy, although she prefers less opprobrious terms, referring to her conduct as merely "too rough" or "too severe." Arguing that she is trying to correct her problem, Norma urges us not to foreclose her right to Sammy until her efforts at rehabilitation are proven unsuccessful.

While it is true Norma has tried to rehabilitate herself, there is no certainty this will succeed; or, if it does, when that will occur. As Dr. Solomons testified, it is difficult to attempt a program of rehabilitation for the parent and at the same time leave the abused child in the home. To protect the child, rehabilitation must be accomplished while the child is away from the home.

This is really what Norma asks. She suggests we put Sammy in a foster home until some later date when she shall have shown her right to have him.

While this is a possible solution, it is one which the trial court rejected and one which is not recommended by the experts who testified in this case. At the time of trial, Sammy was three-and-a-half years old. He had been subjected to physical abuse from the time he was a year old. Dr. Solomons and Dr. Nygard, a psychologist, both said they feared further abuse by Norma. They were uncertain about the time of rehabilitation, if indeed, it should ever be accomplished. Under the facts shown by this record, we agree with the trial court that Norma's parental rights should be terminated now.

We mention one other matter raised by Norma. She objects strenuously because she herself brought this matter to the attention of authorities. Now the very people from whom she sought help are the ones who want to take her child from her.

This argument ignores the primary question—Sammy's safety and wellbeing. We cannot condone continued child abuse simply because the guilty party is the one who reports it. In view of the pessimistic prognostic testimony of the expert witnesses, we refuse to consider further delay in permanently settling Sammy's fate.

Neither do we overlook the argument that it is not only the best interests of the child which are to be considered but also the rights of the mother. While it is true the child is not the only one involved, we have consistently held the child's welfare is our paramount consideration. Although Norma argues this deprives her of due process, she cites no authority to support that constitutional objection. We find no merit in this claim.

Finally, we are told there has been no abuse shown since the 1971 Arizona incident resulting in the fractured skull. Since then, Norma says, she has sought help, and Sammy is now safe in her care.

It is quite true past misconduct should not deprive a mother of her parental rights when she is presently a fit and capable custodian for the child. *In the Interest of Freund,* 216 N.W.2d 366, 369 (Iowa 1974). But the record here does not reflect such circumstances. The evidence is compelling that Norma will again revert to abusive conduct and that Sammy is in danger of further serious injury from her.

We agree with the trial court's conclusions, and the order terminating parental rights is according affirmed.

Affirmed.