# IN THE MATTER OF THE APPLICATION OF THE COMMIS-SIONER OF SOCIAL WELFARE FOR THE CARE, CONTROL AND CUSTODY OF MARIA, ELISA, AND NORMA C., Minors

Civil No. 140/1976

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

November 16, 1978

368

 

POLLY WINTER, ESQ., Deputy Assistant Attorney General (Department of Law, Criminal/Family Law Division), St. Thomas, V.I., *for petitioner*

MARIA T. HODGE, ESQ., St. Thomas, V.I., *guardian ad litem*

CHARLOTTE POOLE DAVIS, ESQ., St. Thomas, V.I., *for Mr. and Mrs. C.*

ALLEN M. TOW, ESQ., Legal Services of the Virgin Islands, St. Thomas, V.I., *for Mr. and Mrs. C.*

FEUERZEIG, *Judge*

### MEMORANDUM OPINION

It has been said that a judge agonizes more about reaching the right result in a contested custody case than about any other type of decision he renders.[1] If that is so, a judge agonizes even more about reaching the right decision when the question is whether or not parents' rights to their children should be terminated. This case presents one of those agonizing situations. Before the court is a petition filed on November 17, 1976, in which the Commissioner of Social Welfare (hereinafter the Commissioner) asks this court for permanent custody of three minor children, Maria C., 14, Norma C., 13, and Elisa C., 11, the children of Gabino and Luz C. The facts will be outlined in great detail, but briefly Mr. C. is 69, while Mrs. C. is a 35-year-old mentally retarded woman who probably is also an epileptic.

---

[1] Fritts v. Krugh, 354 Mich. 97, 92 N.W.2d 604, 606 (1958), quoting Botein, Trial Judge, 273.

Both parents are natives of Puerto Rico, speak only Spanish and are illiterate. Maria, the oldest daughter, speaks only English and has not lived with her mother and father for at least 10 years. Norma, who speaks English and Spanish, and Elisa, who speaks English and a little Spanish, have been living in a foster home with Mr. and Mrs. Jesus I. since April of 1975, when Mr. C. suffered a massive heart attack.

## PROCEDURAL HISTORY

The case, unfortunately, has had a long and troubled history—a history that reveals constant concern on the part of government agencies over the care and treatment afforded these three girls by their natural parents. The trial began in March of 1977,[2] but before completion of the case the parties announced that a consent order granting temporary care and custody of the three children to the Department of Social Welfare for a period of one year would be acceptable. The order, dated May 18, 1977, specifically provided that during the one-year period the Department of Social Welfare was to make every effort to return the children to their parents. The Department also was to assess the parents' needs and develop a program of rehabilitation to enable the parents to provide a suitable home for the children. That program was to include improvement in the cleanliness of the home and development of a more humane attitude by the natural father, Gabino C., towards his daughters, an attitude that would allow them to interact with other children and provide them a variety of so-

[2] The case initially was assigned to the late Honorable Cyril Michael and was transferred to the undersigned shortly after the Territorial Court came into existence on January 1, 1977. Legal Services of the Virgin Islands, on December 3, 1976, entered an appearance on behalf of the parents, and filed an answer on January 18, 1977. The matter first came on for hearing on March 2, 1977, but was continued until March 30, 1977.

cial experience for their emotional development. Instruction to Mr. and Mrs. C. on the proper care and handling of the emotional needs of the children also was to be provided. The parents were given until May 1, 1978, to demonstrate their ability to provide a suitable home for the children.

After the initial temporary custody order, there was considerable progress in cleaning up the parents' home. In addition, Social Welfare, in attempting to bring about a re-entry of the three children into the natural parents' home, instituted regular visitations, with the children spending Saturdays with Mr. and Mrs. C. However, tensions between the natural parents and the foster parents, Jesus and Anna I., arose and the children were thrust into an emotional tug-of-war between the two sets of parents. As a result, Mrs. Sandra Campbell[3] suggested an early resolution because the situation was creating great tension between the two homes, as well as adversely affecting the children.

Accordingly, counsel and the parties were summoned to court on December 13, 1977, for a pretrial hearing. After consultation, a supplemental order was entered delineating and extending the visitations. Specifically, it was ordered that the children would remain with Jesus and Anna I. from Monday through Friday, and that the children were to be taken to Mr. and Mrs. C. by the foster parents at 10:00 a.m. each Saturday and be picked up no later than 5:00 p.m. each Sunday. Again it was ordered that Mr. and Mrs. C. make all reasonable efforts, in conjunction with Social Welfare, to promote the intellectual and emotional development of their children during these visits. This was

---

[3] A social worker with the Department of Social Welfare, who was assigned to work with the children and their parents.

to include, but not to be limited to, making available to the children books, games and free time for socialization with other children.

Unfortunately, this visitation arrangement did not solve the problems or tend to work toward implementation of the goals of the May 18, 1977, Order. As a result, Mrs. Campbell again urged a review of the visitations because it appeared that the weekend visits, rather than bringing the children and their natural parents closer together, were creating additional stresses between Mrs. C. and the children as well as heightening tensions between Mr. and Mrs. C. and Mr. and Mrs. I.[4]

On February 22 the matter again came on for hearing and, after extended consultation, another supplemental consent order was entered by which it was agreed that the children would continue living with Mr. and Mrs. I. until May 1, but that the visitations with Mr. and Mrs. C. were to be limited to 10:00 a.m. until 6:00 p.m. each Saturday. The order also required the Department of Social Welfare, through the Department of Health, to arrange for the psychological testing and evaluation of Mr. and Mrs. C. as well as of the three children. Specifically, the court ordered the Division of Mental Health to examine and evaluate the C.'s and their ability to care for their children from a physical, emotional, intellectual and educational standpoint and to examine and evaluate the condition of each of the minor

---

[4] Another hearing was held on February 17, 1978, at which time the court determined that it was necessary to exercise its power pursuant to 15 V.I.C. Section 827 to appoint a guardian ad litem for the three girls. The matter was continued until February 22, 1978, so the guardian ad litem as well as counsel for the parties could appear.

The court wishes to extend its deepest appreciation to the court-appointed guardian ad litem, Maria T. Hodge. Mrs. Hodge devoted countless hours to this matter and has been of great assistance to the court and to the children in representing them. The court only wishes that the diligent efforts of Mrs. Hodge were typical of all members of the Virgin Islands bar.

children to determine the nature of each child's relationship with each parent.[5]

The matter was set down for hearing on June 6, 1978, and the court heard the testimony of Delreese Roberts, a guidance counsellor at the Lockhart Elementary School; Gloria Etienne, a social worker with the Department of Social Welfare; Dr. Kurt Konietzko, a clinical psychologist and Director of Children Services for the Department of Health, Division of Mental Health; Eunice Summer, clinical director of the Town Clinic with the Department of Health, Mental Health Division; Rodica Thomas, a psychiatric social worker with the Division of Mental Health; and Hilda Daniel, a registered nurse and a nursing supervisor at the Department of Health.

After a half day of testimony and despite initial time estimates to the contrary, the petitioner was unable to complete her case in chief, and the matter had to be continued until July 25, 1978. On that day the court heard only Sandra Campbell, the social worker assigned to the case, and Mrs. Anna I., the foster mother with whom the three children are residing.[6]

---

[5] It had been the hope of the court that this would have been accomplished in sufficient time so that a hearing could have been held in May. However, medical testing could not be completed due to the lack of cooperation by Mr. C. Accordingly, counsel for the petitioner and for Mr. and Mrs. C. asked that the matter not be scheduled for a final hearing until the testing was completed. The Commissioner on May 22, 1978, moved for a hearing on or before June 7, 1978, because two of the Department's witnesses would be leaving the island permanently after the first week in June.

[6] The matter could not be immediately scheduled for final hearing because the then counsel for the Commissioner was terminating her employment with the Attorney General's Office, necessitating new counsel coming into the case and time for her to familiarize herself with the matter. In this case alone, the Commissioner was represented at different times by no less than five different attorneys. Counsel for the C.'s was scheduled to be off-island from August 5 to August 25, and the guardian ad litem was scheduled to be off-island until August 27. Accordingly, the matter was set down for a final hearing on September 7, 1978. This date also had to be changed because it was determined after consultation with all the attorneys that it was unlikely the matter could be completed in one day and the matter was rescheduled for the week of September 18, 1978.

Finally, when the matter came on for hearing on September 18, 1978, Charlotte L. Poole Davis, who had moved on July 25, 1978, to enter as amicus, filed a motion for substitution of counsel. Previously, the C.'s had been represented by Legal Services and had been specifically found by this court to be indigent and authorized to proceed *in forma pauperis*. The C.'s, apparently through financial assistance from friends, decided they wanted their own independent counsel, in particular Ms. Davis. The court initially approved Ms. Davis' appearance on behalf of the C.'s on the understanding that the trial date would not be changed because the court believed that the matter had dragged on too long and needed to be resolved as expeditiously as possible. Unfortunately, Mr. and Mrs. C.'s then counsel, Mr. Tow, had not come prepared to question Mr. C. or put on the case for the C.'s because he had been told by the C.'s that they wanted Ms. Davis, and not him, to represent them.[7] Accordingly, the court most reluctantly granted the C.'s motion for a continuance and the matter was set for hearing on October 3 and 4, at which time the matter came on for final hearing and the court heard the concluding testimony.

This procedural history only points up some of the difficulties in bringing this matter to a resolution since it was

---

[7] Mr. and Mrs. C. had been represented by two other Legal Services attorneys prior to their then counsel Allen M. Tow. Mr. Tow began appearing on behalf of the C.'s on December 13, 1977, and appeared on their behalf at all subsequent proceedings, but most importantly, at the hearings on June 6 and July 25, 1978. Consequently, the court would not grant the request for substitution or the withdrawal of Mr. Tow, but permitted Ms. Davis, in accordance with the C.'s request, to act as lead counsel at the remaining hearings. The C.'s were free, upon coming into funds, to choose whomever they wished to represent them. The court, however, believes that because they are illiterate and speak only Spanish, while Mr. Tow does not speak Spanish, the C.'s are unaware of the extraordinary efforts that Mr. Tow devoted to this case on their behalf. Mr. Tow is to be commended for his unstinting, vigorous efforts on behalf of the C.'s. While this court does not agree with all that he said, Mr. Tow was resourceful and imaginative in attempting to provide the C.'s with the best possible defense. He has set a standard of vigorous and thoughtful advocacy that brings credit to the Legal Services of the Virgin Islands.

filed on November 18, 1976. Only after the court reviewed the exhibits presented at the July 25, 1977, hearing was it discovered that the case of the C.'s was not new to this court. Still pending and never disposed of is Government of the Virgin Islands v. Gabino C. and Luz Maria C., Civil D.R. No. 68/1969, a petition filed on August 11, 1969, by the then Commissioner of Social Welfare for the temporary care, control and custody of four infant children of the C.'s. That matter came on for hearing several times, the last time being January 5, 1970, at which time the record of proceedings reflects that the Attorney General was to state when the case would be ready to be tried. The record in that case reflects that no less than four different attorneys appeared on behalf of the Commissioner with two attorneys having appeared on behalf of the C.'s. The court has given this detailed background to emphasize the time and consideration devoted to this matter as well as to demonstrate that the case now is ripe for determination.[8]

---

[8] This case demonstrates the need for closer attention by all concerned with actions that so deeply affect individual lives. The Attorney General's Office must become sensitive to the fact that such cases must be given priority treatment and not be shuffled from attorney to attorney.

Frankly, I allowed this case to drag on too long in an overly cautious attempt to afford Mr. and Mrs. C. every conceivable benefit given them by Virgin Islands law. My research into this matter now convinces me, though, that Joseph Goldstein, Anna Freud and Albert J. Solnit are correct when they state in their book Beyond the Best Interests of the Child (1973) that

"Procedural and substantive decisions should never exceed the time that the child-to-be-placed can endure loss and uncertainty.

"The courts, social agencies, and all the adults concerned with child placement must greatly reduce the time they take for decision. While the taking of time is often correctly equated with care, reasoned judgment, and the assurance of fairness, it often also reflects too large and burdensome caseloads or inefficiently deployed resources.

"Whatever the cause of the time-taking, the costs as well as the benefits of the delay to the child must be weighed. Our guideline would allow for no more delay than that required for reasoned judgment. By reasoned judgment we do not mean certainty of judgment. We mean no more than the most reasonable judgment that can be made within the time available— measured to accord with the child's sense of time. Therefore, to avoid irreparable psychological injury, placement, whenever in dispute, must be treated as the emergency that it is for the child." p. 42–43.

As Goldstein, Freud and Solnit so aptly state, "three months may not be long for an adult decisionmaker, but for a young child it may be forever." In this case, there is no doubt that for these three children we may well have gone beyond that limitless period of time.

## APPLICABLE LAW

## I

In making its determination this court is aware that the United States Supreme Court has emphasized the importance of the relationship of parent and child.

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), 'basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and '[r]ights far more precious . . . than property rights.' May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, 262 U.S. at 399, 43 S.Ct. at 626, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, 316 U.S. at 541, 62 S.Ct. at 1113, and the Ninth Amendment, Griswold v. Connecticut, 361 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972). Moreover, this court is painfully aware that proceedings for the termination of parental rights, which have not been considered by the Supreme Court, have far more serious consequences than those involving a change of custody of a child. See, e.g., In the Matter of Perkins, 352 N.E.2d 502, 509 (Ind. App. 1976).

■ Thus, this court recognizes that while it has vast power in juvenile cases, it is because of that power that it must be particularly wary of imposing its own views— views that are reflective of upbringing, social and economic

class, education and life experience—on the life styles of others. Deprivation of parental rights is a drastic remedy and may only be resorted to in extreme cases, where it is clear that the parents cannot or will not correct the evils that exist. The severing of family ties is a step of utmost gravity. Therefore, a court must be strictly guided by the statutory grant of authority in making such a determination.

In this case, the court derives its authority from 4 V.I.C. Section 172[9] and 5 V.I.C. Section 2501 et seq. In particular, the court looks to 5 V.I.C. Section 2509(a) which provides:

Whenever in the course of a proceeding instituted under section 2502 of this title, it shall appear to the court that the parents or the surviving parent of a child, or the mother of a child born out of wedlock, have abandoned such child for one year or more or have substantially and continuously or repeatedly refused, or being financially able have neglected, to give such child parental care and protection; or that such parent or parents are unfit by reason of their conduct or condition which is seriously detrimental to the said child, the court shall have jurisdiction to transfer the permanent care, control and custody of such child to some other person, agency, or institution, and may terminate all rights of such parent or parents with reference to such child, and also may appoint a guardian for the person of such child. Such transfer or termination shall be made only after a hearing before the court . . . .[10]

The Commissioner argues that in making a determination as to whether parental rights should be terminated and custody transferred, the court should look to the best in-

[9] 4 V.I.C. § 172 gives this court jurisdiction over any child under 18 years of age living within this judicial division who is neglected or whose environment is such as to injure or endanger his welfare, as well as to determine custody of the person of any child under 18 and to terminate parental rights in such proceedings.

[10] While Section 2509 implies that there is a distinction between transferring permanent care, control and custody of a child and terminating all rights of parents, the court finds no such distinction. The court believes that the provision that gives this court the power to transfer care, custody and control exists so the court may make an award of custody when parents are either dead or unknown.

378

terests of the children. She relies on 5 V.I.C. Section 2513, which states:

> This chapter . . . shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the Territory. . . .

The phrase the Commissioner relies on is "the child's welfare and the best interests of the Territory." While it is arguable that Section 2513, standing alone, would give this court authority to decide on the basis of the best interests of the three children, the court believes that in view of the language of Section 2509 and construction by other courts of language virtually identical to Section 2509, it must reject that interpretation.[11]

This court believes that the controlling test is explicitly established by Section 2509, and that is "that such parent or parents are unfit by reason of their conduct or condition which is seriously detrimental to the said child." This language does not permit an engrafting of the best interest test. This is not to say that evidence of what is in the best interests of a child is not appropriately considered in determining whether the parents are unfit. Evidence that tends to show unfitness a fortiori will demonstrate what is in the best interests of a child. However, the ultimate

---

[11] The Commissioner of Welfare in arguing for application of the best interests test places principal reliance on several New York cases, primarily Bennet v. Jeffreys, 40 N.Y.2d 543, 387 N.Y.S.2d 821 (1976). This court reads Bennet v. Jeffreys as stating that the best interests of the children are to be considered only *after* the court concludes that parental rights should be terminated. This is demonstrated by the fact that the Court of Appeals in Bennet v. Jeffreys was not considering termination of parental rights and emphasized this by stating, "nor does this proceeding involve an attempted permanent termination of custody." 387 N.Y.S.2d at 824. Moreover, the New York statute has been amended since Bennet v. Jeffreys, which caused the Court of Appeals to observe recently that it would be unconstitutional to take away a child from its natural parents simply on "best interests" grounds. In re Curry, 4 F.L.R. 2585 (July 25, 1978). Consequently, the Commissioner's reliance on Bennet v. Jeffreys is misplaced.

question is whether the parents are unfit, and not what is in the best interests of a child.

In In re Walter B., 577 P.2d 119 (Utah 1978), the Utah Supreme Court construed a statute that provided that a court could terminate all parental rights if the court found "that the parent or parents are unfit or incompetent by reason of conduct seriously detrimental to the child." In applying that statute, the court held:

> To sustain a termination, the characteristics subscribed to the mother must represent such a substantial departure from the norm as to constitute a condition seriously detrimental to the child.

Id. at 121. Moreover, the court specifically found that its statute required a rejection of the best interests test:

> The statute does not provide that termination may be predicated on the best interests of the child; this is a standard applicable to a custody disposition. The best interests of the child may be a resulting benefit, but it cannot be the primary point of departure upon which the termination hinges. When a termination of parental rights is involved, there must be strict adherence to the expressed statutory grounds.

Id. at 124–25.

■ The Virgin Islands statute, like the Utah statute, does not permit termination upon a best interests test. Other jurisdictions are in accord, as revealed by decisions from the states of Pennsylvania, In re William L., 383 A.2d 1228 (Pa. 1978), petition for cert. filed, 4 F.L.R. 2593 (May 30, 1978), and Adoption of R.I., 468 Pa. 287, 361 A.2d 294 (1976); Illinois, Interest of Massey, 35 Ill. App.3d 518, 341 N.E.2d 405 (1976), and Interest of Jones, 34 Ill. App.3d 603, 340 N.E.2d 269 (1975); and New Mexico, Huey v. Lente, 85 N.M. 597, 514 P.2d 1093 (1973), specially adopting the concurring opinion of Hernandez, J., 85 N.M. 585, 514 P.2d 1081, 1088 in these states where the statutes are similar to that in the Virgin Islands. Cf. State v. McMaster, 259 Or. 291, 486 P.2d 567 (1971); State ex

rel. Juv. Dept. of Clackamas Co. v. Wiese, 10 Or. App. 73, 498 P.2d 813 (1972) ; State v. Blum, 1 Or. App. 409, 463 P.2d 367 (1970).[12]

Admittedly, several jurisdictions accord the best interests test a high place in determining whether or not a parent's rights should be terminated. See, e.g., In Interest of Vanderbeek, 231 N.W.2d 859 (Iowa 1975) ; Matter of Perkins, 352 N.E.2d 502 (Ind. App. 1976) ; Matter of Adoption of J.S.R., 374 A.2d 860 (D.C. 1977). However, while there is substantial authority for applicability of the best interests test, this court may not substitute what some may believe to be the better standard. That is the task of the Legislature. As the Legislature of the Virgin Islands has spoken, this court must apply the law to the facts in this case.[13]

## II

The court next considers the extent or sufficiency of evidence that must be presented to warrant a conclusion that, in fact, the parents are unfit. Mr. and Mrs. C. argue that in a termination of parental rights case the court must be satisfied beyond a reasonable doubt that the parents are

---

[12] While it is true that the Oregon courts have stated that the best interests of the children are paramount, the Oregon decisions are clear that where a statute speaks of parents who are unfit by reason of conduct or conditions seriously detrimental to the child, termination must be based only upon a finding that the parent or parents are incapable or unable to supply the necessary physical and emotional care for the child and that such a condition probably will continue for enough time to render improbable any successful integration of the child into a family if the parents' rights are not terminated. State v. Blum, 463 P.2d at 3670.

[13] While it has been held that there is nothing constitutionally offensive about a "statutory standard which focuses on the best interest of the child rather than solely on the status or abilities of the natural parent," Matter of Adoption of J.S.R., 374 A.2d 860, 864 (D.C. 1977), this court questions whether the "best interests" test still can be applied in view of the dicta by a unanimous court in Quilloin v. Walcott, 98 S.Ct. 549, 555 (1978).

We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 862, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring).

unfit. The Commissioner contends her burden is a mere preponderance of the evidence. The guardian ad litem suggests that the standard of proof is one of clear and convincing evidence, and that is the standard the court adopts.

While Mr. and Mrs. C. pose an interesting and intellectually challenging argument for application of the beyond a reasonable doubt standard, this court has found no convincing authority for that proposition nor has the court found any decision that has required application of such a standard in an action to terminate parental rights. In fact, such a standard explicitly was rejected by the Minnesota Supreme Court in In re Rosenbloom, 4 F.L.R. 2569 (July 18, 1978). More importantly, the Court of Appeals of Oregon explicitly rejected an attack on the constitutionality of Oregon's statute, which required proof by only a preponderance of the evidence. Matter of S., 26 Or. App. 219, 552 P.2d 578 (1976). The court there was confronted with a challenge by a parent who alleged that her due process rights were not adequately protected by such a standard. Interestingly, the parent argued only for the establishment of the clear and convincing evidence standard. In rejecting this, the court said:

> In view of the governmental function here involved and the stringency of the statutory grounds for termination, we believe that due process is served by requiring the state to show by a preponderance of the evidence that a ground for termination of parental rights exists. The evidence necessary to sever parental rights under the foregoing statutory provisions is indeed substantial.[14]

Id., 552 P.2d at 583–84.

---

[14] Under the then existing Oregon law, in order to terminate parental rights the state was required to prove that:

"... the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the forseeable [sic] future due to conduct or conditions not likely to change ... that

"... the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for one year prior to the filing of a petition . . . or that

■ The Commissioner's argument is equally unpersuasive. She argues that this court should apply the preponderance of the evidence test as was established by statute in Oregon. See State v. Blum, supra. There is, of course, support for this position.[15] The court believes, however, that there is more extensive and persuasive authority for adoption of the clear and convincing or compelling evidence standard.[16] Thus, pursuant to 1 V.I.C. Section 4, the court

---

". . . the parent or parents have abandoned the child or the child was left under circumstances such that the identity of the parent or parents of the child was unknown and could not be ascertained, despite diligent searching, and the parent or parents have not come forward to claim the child within six months following the finding of the child. ORS 419.523.

Id. at 583. Cf. Section 2509, supra, at 378.

[15] In re Perales, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977) (parents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable); In re Scarlett, 231 N.W.2d 8 (Iowa 1975) (petitioner has the burden of establishing facts justifying the termination by a preponderance of the evidence).

[16] In re William L., 383 A.2d 1228, 1233 (Pa. 1978) ("When the child is in the home, this on-going relationship will not be disturbed except upon a showing by clear and convincing evidence that removal is 'clearly necessary' "); Matter of Adoption of J.S.R., 374 A.2d 860, 864 (D.C. 1977) ("the standard enunciated by the trial court, i.e., substantial preponderance of the evidence and the one we establish herein, i.e., clear and convincing evidence, are substantially identical."); Adoption of R.I., 468 Pa. 287, 361 A.2d 294, 298 (1976) ("this court requires a 'demanding' standard of 'compelling' evidence."); In Interest of Massey, 35 Ill. App.3d 518, 341 N.E.2d 405, 407 (1976) ("the best interests of the child can be considered only if the court finds by clear and convincing evidence that the parent is unfit or consents to the severance."); Interest of Jones, 34 Ill. App.3d 603, 340 N.E.2d 269, 273 (1975) ("in order to terminate parental rights, parental unfitness must be shown by clear and convincing evidence"); In Interest of Ybarra, 29 Ill. App.3d 725, 331 N.E.2d 224, 227 (1975) ("Before a court may empower a guardian to consent to an adoption without the consent of the natural parents, there must be clear and convincing evidence of unfitness."); In re Sego, 82 Wash.2d 736, 513 P.2d 831, 833 (1973) ("A synthesis of our cases, as well as some from other jurisdictions convinces us of the logic that clear, cogent and convincing evidence is necessary to sustain an order permanently depriving a parent of the care, custody and control of his children. This is the equivalent of saying that the ultimate fact in issue must be shown by evidence to be 'highly probable.' "); Huey v. Lente, 85 N.M. 597, 514 P.2d 1093, 1095 (1973) ("the quantum of proof required [is] clear and convincing."); In re Voluntary Termination of Parental Rights, 449 Pa. 543, 297 A.2d 117, 119 (1972) ("courts should not disturb the parent-child relationship in the absence of compelling evidence."); In re Armentrout, 207 Kan. 366, 485 P.2d 183, 188 (1971) ("We need go no farther to find clear and satisfactory evidence to sustain the trial court's findings."); In re J.Z., 190 N.W.2d 27 (N.D. 1971) ("findings of fact in a proceeding for termination of parental rights must be supported by clear and convincing evidence."); In re Sweet, 317 P.2d 231,

adopts what it perceives to be the rule of the common law as well as the better rule in cases involving such substantial rights as the termination of parental rights, and adopts the clear and convincing evidence test. See Varlack v. S.W.C. Caribbean, 13 V.I. 666, 550 F.2d 171 (3d Cir. 1977). Cf. Murray v. Beloit, 450 F.Supp. 1145 (D.V.I. 1978).

■ Accordingly, this court concludes that in order to terminate parental rights the Commissioner must demonstrate by evidence that is clear and convincing that the parents' conduct or condition will be seriously detrimental to the children. It thus will be necessary to show something more than a mere preponderance and yet something less than beyond a reasonable doubt. In this court's opinion, this is the equivalent of saying that the ultimate facts in issue must be shown by the evidence to be highly probable.

## III

In addition, Mr. and Mrs. C. argue that any finding of unfitness must be premised only upon conduct or a condition that existed at the time of the hearing. They argue that the court is obligated to investigate the present circumstances of the home and of the parents, and suggest that the court give little, if any, consideration to a past course of conduct or condition. Because the children are now in a foster home, the C.'s argue, "clearly circumstances have changed and stale evidence cannot be used to terminate parental rights."

■ In order to terminate parental rights, a finding of unfitness must be based upon circumstances that justify a

236 (Okla. 1957) ("the parents' special unfitness must be shown by evidence that is clear and conclusive and sufficient to make it appear that the necessity for doing so is imperative."); see In re Harney, 19 Wash. App. 85, 574 P.2d 395 (1978) ("the standard of proof, though, less than 'beyond a reasonable doubt,' is a heavy standard."); accord, In re Ledesma, Fam. No. 977/1977 (Terr. Ct., Div. St. Croix, January 27, 1978).

conclusion that the parents were not only unfit in the past, but that they are unfit at the present and are likely to remain unfit in the future. The crucial consideration, therefore, is the prognosis of the parents' ability in the future to raise and train their children to meet the demands and responsibilities of later life. A condition precedent to a consideration of the prognosis for the future is a finding of present parental unfitness. Highly relevant to such a finding is evidence of past misconduct and/or unfitness. This tends, in the absence of other evidence, to demonstrate a *continuing* inability on the part of the parents to raise their children, and raises an inference of future unfitness. However, where the parents have demonstrated their present fitness, past misconduct will not work to deprive them of parental rights.

■ Although it is true that the Commissioner must prove that a state of unfitness exists on the date of the hearing and that the court may not speculate upon a set of facts that does not exist, it is equally true that in examining the facts the court has a duty to ascertain thoroughly the status of the parents to determine whether they are able, physically, intellectually and emotionally, to provide their children proper care and support. In re Turner, 12 Ohio Misc. 171, 231 N.E.2d 502, 505 (1967). The court believes, therefore, that evidence of the past conduct and condition of Mr. and Mrs. C. must be considered in conjunction with the testimony of the numerous witnesses as to the present conduct and condition of Mr. and Mrs. C.

IV

■ In considering the past conduct of the parents and its effect upon the children, the court also must consider the effect of the new environment created by the foster home in which the three minor children presently live.

However, the court is aware that the parents cannot be declared unfit merely because the welfare of the children might be improved by changing parents or placing them in what this court might consider to be a better home. Adoption of R.I., supra.

There is no doubt that

[i]t is totally inappropriate to weigh the advantages of a foster home against the home of the natural and legal parents. Their fitness as parents and the question of neglect of their children must be measured by statutory standards without reference to any particular alternative home which may be offered.

Fritts v. Krugh, 354 Mich. 97, 92 N.W.2d 604, 613 (1958). Moreover, this court does not believe that the Legislature contemplated that parental rights could be terminated solely because a foster home is able to furnish surroundings that would enable the child to grow as we would desire all children to grow. To paraphrase a Pennsylvania court, Section 2509

". . . was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy."

Adoption of R.I., supra, 361 A.2d at 299, quoting Rinker Appeal, 180 Pa. Super. Ct. 143, 148, 117 A.2d 780, 783 (1955). Therefore, this court cannot and does not make its determination by finding that the home provided by Mr. and Mrs. Jesus I. is a better home than that provided by Mr. and Mrs. C. In fact, the court explicitly refrains from making such a determination.[17]

---

[17] Although the circumstantial evidence certainly would lead to such a conclusion, it was not an issue upon which this court permitted evidence.

■ Having said that, the court believes it also must take cognizance of the fact that continuity of relationships is extremely important to children, for whom severance of close parental ties is usually very painful. T. Goldstein, A. Freud and A. J. Solnit, Beyond the Best Interests of the Child, 20, 31–34 (1973). Continuity of relationships is particularly important here because Norma C. and Elisa C. have lived with the same foster family for three and one-half years and because Maria C. has not lived with her parents for 10 years. Clearly, removal of the children from their foster home could create the same kind of psychological and emotional distress that ordinarily would follow removal from their natural parents' home.[18] See Adoption of R.I., supra, 361 A.2d at 300 n. 13. Consequently, this court does not believe that 5 V.I.C. Section 2509 prohibits the court from considering the children's needs for a stable home and strong, continuous parental ties where, as here, disruption of the family already has occurred. In re William L., supra, 383 A.2d at 1241. Courts have long recognized that a biological parent's claim to a child can be weakened by a long separation that causes the parent's relationship with the child to diminish. Id.

Consequently, while this court cannot and does not consider the relative benefits from residing in the foster home, the court must recognize that from the time of their removal from the C. home, Norma and Elisa have shown remarkable improvement, intellectually, emotionally and socially. Moreover, the three girls have finally been reunited in an apparently stable environment and now have devel-

---

[18] The strength of the emotional ties that can be created by the foster home were discussed recently by the U.S. Supreme Court.

"At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family."

Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2110, 53 L.Ed. 2d 14 (1977).

oped the continuity of relationships so essential to their psychological and emotional well-being.

## V

■ Finally, Mr. and Mrs. C. argue that their rights as parents should not be terminated without a clear showing that all attempts have been made by Social Welfare to rectify the defects, if any, that exist in the home. In this regard, the court believes Mr. and Mrs. C. are correct. Virgin Islands law requires that children within the jurisdiction of this court shall receive the necessary "care, guidance and control, preferably in his [or her] own home." 5 V.I.C. Section 2513. While this is not a clear expression of the imposition of a duty on the Department of Social Welfare, the court believes that Section 2513, when read with Sections 2509 and 2512,[19] requires this court to find that all agency services have been utilized and that there is no likelihood that the seriously detrimental conduct or condition of the parents, if either exists, can be corrected before ordering termination of the parents' rights.

The Utah Supreme Court, construing a statute similar to Section 2509, has ruled that termination of parental rights could not be sustained where there was no evidence that the mother was informed of the alleged inadequacies of the environment she was providing and she was not advised of appropriate remedial action.

Thus, it is a condition precedent to termination that the conduct or condition alleged to be seriously detrimental to the child cannot be corrected, after notice and opportunity implemented, by reasonable efforts of assistance.

In re Walter B., supra, 577 P.2d at 124; accord In re William L., supra. This same requirement has been imposed

---

[19] § 2512. Cooperation
 Every public official or department of the Territory shall render all assistance and cooperation within his or its jurisdictional power which may further the objects of this chapter. . . .

in some jurisdictions by statutes that require the state to show that a parent has failed to correct conditions within a prescribed period of time. See, e.g., Matter of J.F.C., 577 P.2d 1300 (Okla. 1978); In re Clear, 65 Mis.2d 323, 318 N.Y.S.2d 876 (1970).

 Although there is no explicit statutory mandate to this effect in the Virgin Islands, this court believes that the better rule is that it is the duty of the social welfare institutions of this Territory to make every reasonable effort to remedy parental defects before they seek a termination of parental rights. It was for that reason that this court spelled out with some detail in its order of May 18, 1977, the various steps to be taken to assist Mr. and Mrs. C. in improving their home as well as their parenting abilities.

### FACTS

Having outlined the procedural posture of this case and the applicable legal standards, the court now turns to the facts and applies the legal principles outlined above. The facts before the court clearly and convincingly establish that Mr. Gabino C. and Mrs. Luz C. are not capable of adequately parenting their minor children, two of whom are adolescents and the third of whom is approaching adolescence. Without doubt, Mr. and Mrs. C. are incapable of meeting the psychological, emotional, and intellectual needs of their children. At best, the C.'s can provide their three daughters with no more than the basic physical necessities of life.

Mrs. C. gave birth to her first child, Pablo, or William as he is also known, on June 17, 1963. Neither Mr. nor Mrs. C. could state to the court where Pablo is today, but the record is clear, based upon the testimony of Adelle Bell, supervisor of the Division of Foster Care for the Department of Social Welfare, that Pablo was placed in a foster care home

within weeks after his birth. He has never lived with Mr. and Mrs. C. and custody of him is not now before the court.

The second child, Maria C., was born on May 5, 1964. Shortly thereafter it was suggested that Mrs. C. undergo a tubal ligation because of her mental and physical condition as well as the fact that living conditions in the C.s' home were considered inadequate. While at first opposed by the C.'s, the suggestion ultimately was accepted, but for some unexplained reason the operation never was performed. It also was suggested that Mr. C. undergo a vasectomy. That too was agreed to and Mr. C. went to the hospital for the suggested procedure. Again, for an unexplained reason, the vasectomy never was performed. Subsequently, Mrs. C. gave birth to the two other minor girls, Norma C. and Elisa C., who with Maria C. are the subjects of this action.

Mrs. C., at age 35, is illiterate and able to speak only Spanish, and then only in a severely limited manner due to a speech impediment. She has been diagnosed by mental health professionals as mentally retarded, and has ongoing organic complications, possibly epilepsy and/or chorea. In addition, according to health officials, her behavior is such as to strongly suggest that she is a chronic psychotic or schizophrenic. That Mrs. C. is unfit to parent these children, and that placing them in her custody would be seriously detrimental to the children, could never have been made clearer than by her own testimony and actions on the stand.[20] Mrs. C.'s testimony and her bizarre actions in the courtroom throughout the trial and on the stand convinced this court—beyond a reasonable doubt—that she is totally incapable of meeting the needs of her children. Mrs.

[20] It is revealing to note that although it was the burden of the Commissioner to show that Mr. and Mrs. C. were unfit, Mrs. C. was not called by the respondents after their motion for a directed verdict was denied. In fact, Mrs. C. was called to testify as the sole rebuttal witness of the Commissioner.

C., even when able to speak, could hardly be understood by the court's very skilled interpreter, through whom she testified. The interpreter on several occasions had to struggle to understand and translate what Mrs. C. was saying because of her speech impediment, and questions and answers often had to be repeated several times. Moreover, approximately 50 percent of the questions were answered in a "yes" or "no" fashion by a nod or shake of the head. When she did speak, she demonstrated a total lack of emotional and intellectual depth or maturity. The first question she was asked—"How many children do you have?"—provoked a laugh and a sharp thrust into the air of her arm with four fingers extended. When asked the ages of each of her children, she said she could not recall. She then said that the youngest was 11; she could not recall the ages of the other three. She said, "I knew it, but I forgot." She did not know the names of any of the schools that her children attend, but she did indicate on cross-examination by her attorney that she knows where the Lockhart Elementary School[21] is and that it is located within walking distance of her apartment at Oswald Harris Court. When asked her age, she said, "I don't recall; my husband has the papers." When asked about her son Pablo, whom she has never lived with and apparently has not seen for some time, she said, "My son is up and down in the street at night." This also prompted her to cover her face with her hand and pull the collar of her blouse totally over her face and break into a sob.[22]

---

[21] There was no indication, however, that Mrs. C. knew which of her daughters attend Lockhart School.

[22] The court also notes that Mrs. C.'s conduct while on the stand was consistent with her conduct throughout the trial. Mrs. C. sat with one hand clutched to her side and the other alternately covering her mouth and eyes. She frequently sobbed, grimaced and gesticulated as if she had been startled. Her physical movements were erratic and exaggerated. Although a court interpreter was present throughout, Mrs. C.'s actions were in no way related to the translation being provided. In fact, she appeared to pay little attention to what the interpreter was saying, and, in the court's opinion, lacked the ability to comprehend what was being said.

Mrs. C. stated that she takes care of the home. "I wash clothes, mop the floor, prepare the food for the children." She does not go out except to see a few neighbors. She has never even gone to the store by herself to buy groceries, although the Grand Union and Pueblo Supermarkets are within walking distance of her home. In fact, the only time she goes to any store is in the company of her husband or another person.

The testimony described Mrs. C. as "childlike," "dependent," "autistic," "agitated," and "hyper." She grimaces often, without apparent cause, and walks stiffly and rigidly with jerky movements. To those who have had occasion to visit her in her home, she was observed wiping away nonexistent cobwebs from the walls, compulsively straightening furniture and, in general, exhibiting strange, inexplicable behavior.

Despite testimony from Mr. C., as well as from her brother-in-law, Victor Davis, that Mrs. C. can talk with her children, there is absolutely no credible evidence that she can in fact communicate sufficiently with the children to aid them in their emotional, psychological or social, let alone intellectual, development. Maria, the eldest child, speaks virtually no Spanish, and Elisa, the youngest, little more. No credible evidence was adduced by which this court could find that Mrs. C. engages in, has ever engaged in, or for that matter that she ever will be able to engage in a normal conversation with her children. The extent of her communication with the children relates to basic minimum needs—food, washing, and going in and out of the house. Mr. C. and Mr. Davis, although stating without hesitation that Mrs. C. communicates well with her children, could not give a single example of one discussion regarding something other than the basic necessities of life.

As if she does not have enough problems, Mrs. C., a diminutive woman, apparently has been mistreated by her

husband and often has been treated by him as if she, too, were one of the children. Mr. C. tried to persuade the court that Mrs. C. was independent and capable of coming and going on her own. This was in direct conflict with testimony that she rarely goes out except for brief visits to a few neighbors and in the wake of testimony that Mr. C. had in the past locked Mrs. C. in the house to prevent her from going out. In an effort to demonstrate that this was not the case, Mr. C., while testifying, turned to Mrs. C. and ordered her to produce the house key. Startled by his command, she dutifully opened her straw bag and produced a key—with a look of total bewilderment. This incident succinctly sums up the relationship of Mr. C. with his wife—one of total domination over her.

Moreover, although Mrs. C. denied ever stating it, she told the social worker in confidence that she wanted to leave her husband and go back to her family in Puerto Rico. As Mrs. Campbell pointed out, though, the reality of this situation is that Mrs. C. has not been in contact with her family since she left Puerto Rico in 1963 and is absolutely incapable, financially, emotionally or otherwise, of carrying out her plans of leaving because she is totally dependent upon Mr. C.

Clearly, the court has no doubt in finding that Mrs. C. is incapable of meeting the essential needs of these children, and is therefore unfit within the meaning of 5 V.I.C. Section 2509.

In the case of Mr. C., the evidence is not as overwhelming as in the case of Mrs. C., but it does clearly convince the court that he, too, is incapable of parenting these children and that if the children were placed in his custody, it would be seriously detrimental to their well-being.

Mr. C., much older than his 35-year-old wife, now is retired at 69 years of age. He also is illiterate and speaks only Spanish. Today, apparently with some justification, he

is a very angry man. He deeply resents Mrs. I., the foster mother, who now has custody of his children, and, in fact, characterized her as a "dog." Unlike Mrs. C., who virtually was untestable, Mr. C. has an I.Q. of 93, which places him on the low-average end of the intelligence scale. The psychological tests administered to him indicated what social workers and others testified to, and what the court has determined to be, a pattern of Mr. C.'s approach to life— rigidity of thinking and inability to correctly evaluate and make sense of social situations. His contact with reality and with today's society indicates that he will never be able to develop an adequate appreciation of the needs of any of his children or of the problems of his family. The psychologist's summary of Mr. C. states:

> Mr. C., according to our findings is a 69 year old man, who is low average in intelligence, and who probably functioned somewhat better when he was younger. He seems to have a number of physical problems and at times may become seriously disturbed. He is not defective nor is he severely disturbed at this time, although he has some personality traits which have created difficulties for him in the past and probably will do so again in the future.
>
> Mr. C. does not seem to be a particularly sensitive person to the needs of others, although he would adequately take care of his children's physical needs. He does not possess sufficiently adequate parenting skills to warrant the children being placed in his care. When Mr. C. and Mrs. C. are considered together as parents, returning custody of their children to them is undesirable.

This opinion of psychologist Dr. Kurt Konietzko and psychiatric social worker Rodica Thomas was borne out by the testimony of the social workers and of Mr. C. himself.

Mr. C.'s testimony, more than anything else, revealed an individual who, as pointed out, is extremely angry and who is either a pathological liar or is totally unwilling or unable to come to terms with the realities of the world in which he lives. The court believes it is clearly more a case of rejection of reality. On April 1, 1975, he suffered a

massive heart attack, which required hospitalization for 30 days. He still has not admitted that that was what he suffered. He referred to it as—and said one doctor told him that it was—bronchitis or pneumonia. He denies that Mrs. C. has ever struck any of the children, although I find that she has. He states that he has never had any arguments with his wife in the house or any arguments with his wife in front of the children, although I find that he has.[23] Any suggestions to the contrary, in his opinion, "were made up by Mrs. Anna I. in order to live off the children."

Mr. C. believes that there is a conspiracy to deprive him of his children. On one occasion in July of 1978, for example, one of his daughters was given some money to make a purchase. He, being unwilling to let the children walk the short distance from the Oswald Harris Court to the nearby Lockhart Shopping Center where Woolworth's is located, insisted on accompanying them. At the trial he testified that he was being watched during the trip to Woolworth's by others who had come from the "country" with the intention of trying to deprive him of his children. I find the conspiratorial overtone of this episode to be solely the product of Mr. C.'s mind, and not based on any supportable facts.

There is no doubt that Mr. C. made tremendous strides in trying to remedy the uncleanliness that existed in the home when the matter first came on for a hearing. In fact, based upon the testimony, the court finds that in March of 1977, the house was dirty, disorderly and cluttered with numerous articles of junk, including several old, unworkable televisions. The bedrooms and the bathroom smelled of urine and were rarely in a sanitary condition. That situation has been remedied to a great extent. In fact, Mr. C.

---

[23] For example, despite clear and convincing evidence that an altercation took place on April 11, 1978, between Mr. and Mrs. C., during which Mr. C. injured Mrs. C., he totally denies the incident.

had the apartment refurnished and painted and considerably improved the appearance of the home and the court does not, therefore, find that Mr. and Mrs. C. are unfit parents because of the prior uncleanliness of their home. On the contrary, the home now appears to be clean and physically unobjectionable.

Mr. C., however, is not able to make the necessary improvement in his understanding of the children and his inability to provide them with the appropriate tools to grow intellectually, socially and emotionally. In the opinion of Rodica Thomas, the psychiatric social worker, Mr. C. has absolutely no understanding of the children's psychological or intellectual needs. This, coupled with Mr. C.'s unwillingness to recognize his own limitations and problems, and the problems of his wife, renders him incapable of meeting the children's needs.

One of Mr. C.'s greatest difficulties is his attitude toward his wife. Here again, either he has absolutely no ability to comprehend or is totally unwilling to recognize her mental retardation, physical dysfunction and bizarre behavior. In his mind, she has an "illness," but it is strictly a "nervous" condition—a condition that to Mr. C. means when she has "those things," she remains bothered for only five minutes or so and then is fine. He recognizes, however, that she has always been under the treatment and care of doctors, but doesn't know what medication she takes, other than that she must take a big pill and a little pill every day. In his opinion Mrs. C. does everything in the house, "sweeps, mops, cooks, washes, irons, everything." He is totally unwilling to admit that his wife is mentally and physically handicapped, which considerably undermines any ability he might have to parent his children and nurture an appropriate understanding by them of their mother's severe difficulties. His denial of what they have seen on countless occasions clearly

is seriously detrimental to their emotional and intellectual growth and stability.

In addition, he states that Mrs. C. is able to talk with all the girls and that he likewise is able to do the same. This clearly is not the case. Mrs. C. talks rarely with the children, partly because of the language barrier. Although Maria has not lived in the house for at least 10 years, he says the relation between Maria and Mrs. C. is that of a mother and daughter; they treat one another well. This is in direct contradiction of all the testimony that demonstrates that Maria and her mother are not remotely close. Moreover, there is an abundance of evidence that causes this court to believe that Maria has deep-seated fears of both her mother and father.

Mr. C. stated that he treats all the children equally. When asked whether he was closer to Norma and Elisa, he said, "I treat them all equally, and the little boy, too." Pablo has not, however, been in the home since infancy, and is now 15 years of age. (See p. 398, n. 25.) In fact, when queried on cross-examination as to whether he meant what he said when he stated he treated all *four* children equally, Mr. C. said, "Exactly."

There is no dispute that Mr. C. wants custody of his children, and appears to love them very much in his own way.[24] Just as the court cannot consider the wishes or desires of the children in this matter in view of the statutory criteria, the court cannot give any weight to the desires and wishes of Mr. C. "A mere 'desire' to perform parental duties is insufficient to preserve the parent-child relationship." Adoption of R.I., supra, 361 A.2d at 299 n. 10, citing, Appeal of Diane B., 456 Pa. 429, 32A.2d 618 (1974).

---

[24] The years of separation, however, have appeared to cause Mr. C. to love the idea of custody of his children as much as his children. When asked directly, "Do you love your children?", he responded, "I want the custody of my children."

These facts demonstrate that Mr. and Mrs. C., individually, and more importantly, as husband and wife and father and mother are totally incapable of parenting any of their three daughters.

The eldest of the three girls is Maria C. who is now 14. By Mr. C.'s testimony she has not lived in the home of the C.'s since 1965 or 1968.[25] Thus, except for visitations, Maria has not lived in the home for between 10 and 13 years. She rejoined her two sisters in April of 1977 and has since been living with them in the foster home of Mr. and Mrs. Jesus I. During that time she has become close with her sisters. She speaks English, but speaks only the scantest of Spanish. She has no desire to learn Spanish. Eunice Summer, the director of the Town Clinic of the Division of Mental Health, testified that Maria uses this as an excuse so that she will not have to talk to her parents. Moreover, Maria told Mrs. Summer that she, Maria, is afraid of her mother because at one point in time her mother threatened to kill her.[26] As a result of the language barrier and her fears, there is no direct communication between Maria and either of her parents. In fact, there is little indication of any mother-daughter or father-daughter relationship with her natural parents.

At the time of her placement, which the court believes to have been sometime in 1967 or 1968, Maria was thought to be a retarded child, unable to communicate, extremely withdrawn, shy and unresponsive. After placement in a foster home, she began to progress, although the testimony

---

[25] Even when probed extensively on this point, Mr. C. insisted that Maria had not been in the home since their second daughter Norma was born in November of 1965. The records of the Department of Social Welfare and the testimony would point to the conclusion that Maria was not removed from the home until August of 1967 or sometime in 1968 when Mr. C. voluntarily placed Maria in a foster home with his son Pablo or William.

[26] The court does not find that Mrs. C. actually threatened to kill Maria, but the court does find that Maria believes that her mother threatened to kill her and expressed this and her fears of her mother to Mrs. Summer. The court considers these hearsay statements of Maria pursuant to Rule 803(3) or (4) of the Federal Rules of Evidence.

indicates that she still is somewhat shy and withdrawn. Maria, now in adolescence, will need considerable guidance and help as she faces development as a teenager and young adult. The evidence indicates that neither Mr. nor Mrs. C. is capable of helping Maria cope with the problems of sexual development, let alone such a simple physical condition as menstruation. The testimony indicated that the attitude of Mr. C. towards sex is rigid. It borders on the superstitious. Evidence suggested that when Maria and Norma have their menstrual periods, they are not permitted to lie down and are prohibited from eating certain foods. In fact, when queried on this, Mr. C.'s testimony revealed a total misunderstanding as to what the children were experiencing, suggesting that during menstruation limes and sour foods should not be eaten because they are dangerous.

Maria's fears of her mother and father, whether well-founded or not, do exist. While they have to a great extent been ameliorated by her placement with Mr. and Mrs. I. and the renewal of a relationship with her sisters, her need for further guidance and development of self-confidence and socialization would be crippled by a return to her natural parents. In fact, the testimony clearly indicates that a return to the C. home would rekindle her fears, heighten her tendency to be shy and withdrawn, retard any progress toward emotional, social and intellectual development and, thus, be seriously detrimental to her.

Norma C., born July 21, 1965, is 13. She, more than her sisters, has been under the greatest tension and stress as a result of her relationship with her natural parents. With Maria not speaking Spanish, Norma has been thrust into the role of the family translator when in the C. home. Even then, except for visitations, she has not been in the home of Mr. and Mrs. C. since April of 1975, when Mr. C. suffered his heart attack. She has been in the home of Mr. and Mrs. Jesus I. for those past three and one-half years.

This has created a situation of divided loyalties between her natural parents and foster parents, as well as confusion as to her relationship with her sisters and her mother. In one incident Norma and her mother had an altercation that resulted in Mr. C. reprimanding the mother for hitting the child. This incident reveals the sort of role reversal that exists in the C. home and points up the type of emotional stress and conflict that Norma has been subjected to and to which she would return if placed back in the home of Mr. and Mrs. C.

Before her placement in the foster home, Norma was observed to be shy, withdrawn and reluctant to speak to adults. When she did speak, it was in the form of short phrases. She had an appearance that indicated she was not receiving proper nutrition, which is not at all surprising, given Mr. C.'s testimony that he always let the children eat what they wanted and gave them little, if any, guidance on what foods they should eat. Her foster mother, in fact, testified that shortly after Norma came to live with her, they went shopping. Mrs. I. testified that she asked Norma what were her favorite foods, and Norma led her to a row of pet foods and pointed to a can of "Alpo" dog food. Mr. C., however, denied ever feeding the children dog food. In any event, upon initial placement, Norma exhibited poor eating habits. She also had experienced little socialization and seemed to have few friends. At that time she was enrolled in a nongraded class.

Today, Norma still retains the scars of her early childhood, but has become more socialized, able to interact with her peers and is enrolled in a graded class at the appropriate level. Most striking, however, was the analysis of Eunice Summer, the psychiatric social worker. Based upon her interviews with the children, a review of the medical records of the C.s and the children, a visit to the C.s' home while the children were there as well as a visit to the

foster home, Mrs. Summer believes that Norma is thrust in the role of being a parental child or surrogate mother. This analysis was corroborated by others. In Mrs. Summer's view, this role requires an overwhelming effort on Norma's part, an effort that, if allowed to continue, is "doomed to fail" and that can only immensely damage the self-image of the child. The role of surrogate mother was carried to the extreme with Mr. C. overtly favoring Norma over the other children as well as Mrs. C. In fact, the evidence leads this court to believe that before Norma's removal from the C. home, Mr. C. slept with Norma while his wife slept in another room with Elisa. As Mrs. Summer convincingly explained, it is normal for an adolescent of Norma's age to be rebellious toward authority. As difficult a time as adolescence may be, it is a period that sees the psychological formation of one's identity and the establishment of one's independence. However, this natural development of self-expression and independence is severely stifled and frustrated when Norma is in the home with Mr. and Mrs. C. Rather than being permitted to rebel, according to Mrs. Summer, Norma is cast in the role of the enforcer of the rules and standards that her father has imposed. Thus, when she is in the C. home she is asked to stifle her own natural development as well as that of her sisters, which will inevitably create inner stresses and tension among the three children.

Placement in the foster home has resulted in considerable diminution of the surrogate mother role. Although Norma still has a tendency to be domineering in her relations with her sisters, she appears to be developing a more natural relationship with them and appears to be more comfortable with her role as a child. This caused Gloria Etienne, another social worker, to conclude that Norma appeared to be happier and more content now than when she lived with her natural parents.

Elisa C., born June 9, 1967, is now 11. As the youngest of the children, she lived with her parents only in the tender years of her life, having been placed in the home of Mr. and Mrs. Jesus I. in April of 1975 when she was eight. She has an extremely close relationship with her sister Norma, speaks English and limited Spanish, but she, like Maria, relies on Norma to be the translator when in the C. house.

In 1975, when the children were removed from the home, Elisa was a shy, withdrawn child, and was thought by some to be mentally retarded. She also exhibited poor eating habits. To those who viewed her, she seemed fearful. Mrs. I. testified that when Elisa first came to live with her, she would often run to hide when people came to visit. She was frequently nonverbal, pointing to things she wanted rather than speaking. In school, she was in a nongraded class. Today, on the other hand, she interacts more freely with adults, is in a graded class and has developed several friends and good relations while attending summer camp. She appears to be in normal health and there is no indication of any mental retardation.

Elisa, according to Delreese Roberts, guidance counsellor at the Lockhart Elementary School, presently is in the fifth grade of the regular class. Before entering second grade, she was in a nongraded class. Based upon the testimony of Edwina Gumbs, another teacher at Lockhart Elementary School, Elisa was held back for two years. Ms. Gumbs had Elisa when she was in a nongraded 2-to-3 special class, and had no problems with her, although she was two or three years behind in her reading. In fact, she testified that after being in 1-C the first year, Elisa spent two years in the nongraded 1-to-2 class before moving on to the 2-to-3 nongraded class and then moved on to the fourth and now is in the fifth grade. In brief, according to the guidance counsellor at Lockhart Elementary School, before 1975 Elisa was in nongraded classes and now is in a regular class.

Social worker Gloria Etienne testified that before placement in the foster home, Elisa was dull, unresponsive and isolated. Subsequent to her placement in the foster home, she became more alert and responsive and her relationship with her sister Norma was much less strained. Ms. Etienne said that she saw the children regularly from January 1975 through November 1975, although only occasionally after that.

Mrs. Campbell's testimony is even more persuasive. Her contact with the C.'s began in April of 1975 as a social worker in the foster care unit. Thus, her first contact with the C.'s was after the placement of Norma and Elisa with Mr. and Mrs. I. Nonetheless, she found Mr. C. treating Mrs. C. like a child. In her opinion, Mr. C. was domineering and never permitted Mrs. C. to have a meaningful role in the family, while Mrs. C. was submissive and hesitant even to talk in the presence of Mr. C. In her numerous visits to the C.s' home when the children were present, she observed no communication between Mr. and Mrs. C. Both parents also avoided verbal contact with the children. While in the home, Mrs. Campbell said Mrs. C. demonstrated the same hyperactive, strange behavior she exhibited in court and has shown to others. She spoke in phrases and outbursts, and was handicapped by her speech impediment. Mrs. Campbell, who had resided 16 years in San Juan, Puerto Rico, is fluent in both English and Spanish, and thus is capable of communicating with both parents and the children, but because of Mrs. C.'s speech impediment also had great difficulty communicating with her. In her opinion, there is absolutely no way that the C.'s ever could meet the needs of these children. From an educational standpoint alone, she said she observed no books, magazines or educational literature, or even a clock, in the home, despite her urging that such items be placed there.

Being fluent in Spanish, Mrs. Campbell was called upon to work closely with the parents to try and implement this court's order of May 1977 so that the C.'s could resume custody of their children. It was hoped that through a regular visitation program this could be accomplished. However, in the case of both Norma and Elisa, as well as Maria, the Saturday or weekend visitations were most unsuccessful. Rather than provide a basis for bringing the girls and their parents closer, the visits have had adverse effects. During the visits there was little if any communication between the girls and either of their parents. They would be forced to bring games or books to amuse themselves because there were no games, books, magazines or other reading materials. Communication, if any, would be between Norma and Mr. C. as she again was thrust into the role of the mother-wife substitute. Suggestions aimed at aiding the emotional, intellectual and social development of the girls were ignored or disregarded. Despite promises, for instance, to take the children to the beach, Mr. C. did nothing more than take the children to church and for visits to the home of their uncle, Victor Davis, or other nearby residents in Oswald Harris Court. In Mrs. Campbell's opinion, the attitudes of Mr. and Mrs. C. are such that rather than the parents parenting the children, it appears that the children ultimately would be bringing up the parents. She expressed grave doubts that the C.'s ever will be equipped to provide their daughters with proper sex education, particularly in view of Mr. C.'s attitude towards sex, let alone able to foster their intellectual, emotional and social development.

As this court has held, there is a duty on the part of the Department of Social Welfare to provide services in an effort to try and help keep the C. family together. Unfortunately, Social Welfare has been handicapped in attempting to meet the needs of Mr. and Mrs. C. because the C.'s

are illiterate and speak only Spanish and in the case of Mrs. C., only with a severe speech impediment. However, Mrs. Campbell testified, and this court finds, that every reasonable attempt to improve conditions in the C. household has been made by Social Welfare and other agencies of the Government of the Virgin Islands on a continuous and on-going basis at least since 1963. Psychiatric care, psychological counselling, special medical assistance, public housing, food stamps, welfare assistance and counselling have been provided, but all to no avail.

Thus, the C.'s have had a history of past dependence upon public service agencies and, as Mrs. Sandra Campbell states, it would be unfair to suggest anything other than increased services were custody of the children to be returned to Mr. and Mrs. C. This court would not hesitate to order such an increase in services if it were convinced that an increase would result in remedying the defects that the court finds to exist. The court is of the belief, though, that the condition of Mrs. C. is basically incorrectable. Mrs. C. barely is able to take care of her own physical needs, but little more. The court cannot help but note that one Saturday, during the course of this proceeding, while the children were visiting and Mr. C. had left the house, Mrs. C. had an apparent epileptic seizure. During this time Mrs. C. remained rigid and immobilized with her eyes unfocused, looking upward. This frightened the children and left them in a position where they were not being taken care of, but, rather, found themselves mothering their mother. Epilepsy alone certainly would not provide a basis to conclude that Mrs. C.'s condition was seriously detrimental to the children, but Mr. C.'s attitudes, plus Mrs. C.'s other handicaps, prevent the children from being able to deal with such situations in an appropriate manner, without their suffering grave emotional problems.

In the case of Mr. C., the court believes that because of his age, his obviously rigid beliefs and harmful behavioral patterns cannot be changed in any meaningful way. This is not due to a language or a cultural barrier. Language did not prevent Mr. C. from understanding what was expected of him in cleaning and improving the appearance of the home. However, he is unable to comprehend the necessity for making those changes that are crucial to ensure the future intellectual and emotional development of his children.

Consequently, although this court has concluded that Mr. and Mrs. C. are entitled to and, in fact, have received the services of the Department of Social Welfare to help them achieve the end of being competent parents, the court cannot help but conclude that neither Mr. nor Mrs. C., individually or as a team, can ever be adequately counselled or taught the skills necessary to parent Maria, Norma and Elisa C.

No testimony was offered by the respondents to lead this court to a contrary conclusion. Only one witness was called on their behalf who has had any real exposure to the C.'s or to their children: Victor Davis, Mr. C.'s brother-in-law. Since 1963, he has lived only a few blocks from the C.'s, and his now deceased wife was said to be as close to Mrs. C. as a sister. Thus, it was not surprising when he characterized the C.'s as normal individuals with only minor or insignificant problems and when he said that Mrs. C. has only a "nervous" thing, but "apart from that she is a normal person just like us." Having so testified, he could not, although pressed, state any instance when Mrs. C. ever held a meaningful conversation with any of her children. Although he testified that Mrs. C. had been taking care of her children for the last 11 years, he could not state how this was accomplished. The validity of his testimony is further questioned by his open contempt of Mrs. Anna I.,

which suspiciously echoed that of Mr. C. Yet he admitted that he had never been in her home or ever had any meaningful contact with her, and that at no time has he ever seen the children with her in the foster home.

Mr. Davis was called principally, as was Dr. Eric O'Neal, to establish the fact that much of Mr. C.'s conduct is a result of his cultural heritage. Having been born in Puerto Rico, Mr. and Mrs. C. attempted to establish that their overly protective attitudes towards their children were culturally rooted. Even Mr. Davis, however, conceded that children as old as Maria and Norma are capable of walking alone as far as the Grand Union or Woolworth's and that during the day there should be nothing to preclude them from going out to play unchaperoned. However, in sharp contrast to Mr. Davis' concession are Mr. C.'s actions. When the children came for weekend visits, Mr. C., under prodding from Welfare, would let the children go out to play, but would wear a whistle around his neck and whistle them back whenever he felt they had gotten too far away. Often, in the past, they were prohibited from even going outside to play. Mr. C.'s overly strict attitudes towards his children, which perhaps in part can be attributed to his cultural heritage, by themselves would cause this court no major concern. However, viewed in the context of the total family and its multitude of insurmountable problems, Mr. C.'s strictness becomes but one more indicator of his inability to parent his adolescent and preadolescent daughters. When his role is coupled with that of Mrs. C. and her influence on the family, there is no way for this court to conclude anything, but that he is unfit.

The only other witness to testify as to the parenting abilities of Mr. and Mrs. C. was Dr. Eric O'Neal. Dr. O'Neal's testimony, however, was of extremely limited value. Although he has known the C.'s for 15 years, he had never examined either of them until July 11, 1978, when

they were sent to his office with a request for an opinion as to whether they could parent their three children. He conceded that he did not know the children, and in fact, he never saw the parents interact with any of their children. He rendered an opinion that they both were in good physical health and quite competent to raise their children. His impression of Mrs. C. was that she was slightly mentally retarded.

It must be emphasized that Dr. O'Neal had never been in the foster home, let alone with the children. More importantly, he was given no medical history of either Mr. C. or Mrs. C. He was unaware that Mr. C. had had a heart attack. He was unaware that Mrs. C. was diagnosed as a possible epileptic or of the numerous psychological and psychiatric examinations that had been conducted over the years. Moreover, although he concluded that the parents were in good physical health and competent to raise the children, he stated that this opinion was based upon the information that had been presented to him at the time of the examination.

Quite frankly, Dr. O'Neal's testimony, based as it was on one physical examination in July, without any reference to the medical or social history of either of these individuals, without any ability to determine how they interact either with their children or between themselves, and without any knowledge of several of their characteristics that were testified to during the course of the trial, is of minimal value. Moreover, there is no indication that Dr. O'Neal has had any psychiatric training or was otherwise specifically qualified to render an opinion as to the C.s' parenting abilities.

These facts highlight four full days of testimony and the exhibits introduced into evidence.[27] They paint a picture

---

[27] The court, in making its findings, has considered only the admissible testimony and documentary evidence, and has not considered the inadmissible testimony and evidence. The hearsay testimony so strongly objected to by

of two individuals, both of whom apparently love their children in their own ways, but who are incapable of meeting their needs. If they are given custody of their three children, two teenage girls and one who will enter her teens shortly, the effects are likely to be much more seriously detrimental than they were in the past when the children were young. In fact, the results may well be tragic.

Because of the gravity of this decision, the court does not reach its determination without great anguish. However, based on the foregoing facts and law, I conclude that both the conduct and condition of Mr. and Mrs. C. are such as to be seriously detrimental to their three daughters, that the petition of the Commissioner of Social Welfare must be granted and that permanent care, custody and control of Maria C., Norma C. and Elisa C. should be awarded to the Commissioner of Social Welfare.

</div>

---

the respondents, although probative and relevant, was relied on only where corroborative of other, admissible testimony. Plaintiff's exhibits 4 and 5 are likewise merely corroborative of the testimony adduced at trial, and have not been relied on otherwise.